1999 UT 79

**STATE of Utah, Plaintiff and Petitioner,**

v.

**Michael Charles LAYMAN, Defendant and Respondent.**

No. 980150.

Supreme Court of Utah.

Aug. 27, 1999.

Jan Graham, Att'y Gen., Kris C. Leonard, Asst. Att'y Gen., Salt Lake City, Kenneth R. Wallentine, Vernal, for petitioner.

Alan M. Williams, Vernal, for respondent.

ZIMMERMAN, Justice:

¶ 1 This case comes to us on a writ of certiorari to the Utah Court of Appeals. The defendant, Michael Charles Layman ("Michael"), was convicted after a bench trial of: (i) driving under the influence of alcohol or drugs, a class B misdemeanor, in violation of Utah Code Ann. § 41–6–44 (1998); (ii) possession of a controlled substance with intent

to distribute, a second degree felony, in violation of Utah Code Ann. § 58–37–8 (Supp. 1998); and (iii) possession of paraphernalia, a class B misdemeanor, in violation of Utah Code Ann. § 58–37a–5 (1998). The court of appeals affirmed the conviction for driving under the influence of alcohol or drugs but reversed the convictions for possession of a controlled substance with intent to distribute and possession of paraphernalia. *See State v. Layman*, 953 P.2d 782, 792 (Utah Ct.App. 1998). The State petitioned for a writ of certiorari which we granted. We affirm the court of appeals' holdings. The driving under the influence conviction is not being appealed and will not be discussed here.

¶ 2 The State argues that we should overturn the court of appeals because it improperly employed the reasonable alternative hypothesis doctrine in reviewing the evidence before it and then substituted its judgment for that of the trial court on factual issues. While we find the court of appeals' discussion of the reasonable alternative hypothesis doctrine problematic and unnecessary, we do conclude that there was insufficient evidence to convict Michael under a theory of constructive possession for either possession of a controlled substance with intent to distribute or possession of paraphernalia. Therefore, we affirm.

¶ 3 On a writ of certiorari, we review the decision of the court of appeals and apply the same standard of review applied by that court. *See State v. Harmon*, 910 P.2d 1196, 1199 (Utah 1995) (citing *Butterfield v. Okubo*, 831 P.2d 97, 101 n. 2 (Utah 1992)). The court of appeals, on appeal, reviews the facts in the record in the light most favorable to the verdict. *See State v. Brown*, 948 P.2d 337, 339 (Utah 1997); *State v. Johnson*, 821 P.2d 1150, 1153 (Utah 1991). Therefore, we recite the facts accordingly. *See id.* On the evening of August 11, 1996, Michael drove his father, Hobart Layman ("Hobart"), to the home of Gina Ziegenhirt ("Gina") in Ogden. Hobart was going to Vernal to sell methamphetamine and asked Gina to come along, telling her she could double her money. Gina consented, and Michael drove Hobart and Gina to Vernal in his Chevy Malibu. Despite Michael's appearing to be upset with

his father for inviting Gina along, Michael and Gina commiserated over the difficulties each was having with their children while Hobart slept on the trip.

¶ 4 Upon arriving in Vernal in the early-morning hours of August 12th, Michael, Hobart, and Gina went to a motel. Once in the motel, Michael went into the bathroom for a period of time. After Michael finished, Hobart went into the bathroom and remained there for "quite a while." Hobart measured the methamphetamine in the bathroom. In total, the three were at the motel for twenty to thirty minutes.

¶ 5 After the motel stop, Gina and Michael left Hobart at another location in Vernal. Before leaving his companions, Hobart handed a black pouch containing methamphetamine, scales, two used syringes, some unused syringes, and a spoon to Gina. Gina understood the pouch and its contents to belong to her and Hobart. She placed the pouch in her waistband. Hobart told Michael that he would call Michael at his sister's house when Hobart was ready to be picked up.

¶ 6 At approximately 3:00 a.m., after Michael and Gina had left Hobart, Deputy Shaun Abplanalp stopped Michael because his taillights were not functioning. After Deputy Abplanalp turned on his overhead lights, Michael jerked his car to the right and then jerked it back to the left so that Michael's car was perpendicular to the police car when it stopped. Michael got out of his car, walked briskly toward the deputy, and asked why he had been stopped. The deputy explained that Michael's taillights were not working. Michael gave the deputy his driver's license and registration and then unsuccessfully attempted to fix the taillights. Michael appeared upset, fidgety, and had red, watery, bloodshot eyes.

¶ 7 Deputy Abplanalp approached Gina; she gave him her name and date of birth. The deputy returned to his vehicle and checked both names. Finding no outstanding warrants, the deputy returned Michael's driver's license and registration. Suspecting that Michael may have ingested controlled substances, Deputy Abplanalp asked Michael if he had any controlled substances, para-

phernalia, or alcohol in the vehicle. Michael responded negatively. Deputy Abplanalp asked to search the vehicle, and Michael consented.

¶ 8 Deputy Abplanalp asked Gina to step out of the vehicle and asked if either Michael or Gina had weapons on their persons. They said no. The deputy asked Gina to lift her shirt slightly above her waistline and observed what he believed to be a holster pouch in her waistband. Deputy Abplanalp asked Gina if the pouch contained a weapon; she stated that it did not. The deputy asked her if he could search the pouch. When the deputy asked Gina for the pouch, Gina was looking at Michael and he shook his head in a negative fashion for an unspecified length of time. The deputy took the pouch from Gina and opened it. He found methamphetamine, scales, two used syringes, other unused syringes, and a spoon with residue on it. Deputy Abplanalp then arrested Gina.

¶ 9 By this time, two other law enforcement officers had arrived on the scene, Officer Bo Faircloth and Deputy Don DeCamp. Deputy DeCamp conducted field sobriety tests on Michael, after which Deputy Abplanalp placed handcuffs on Michael. Michael was taken to a hospital to have his blood drawn. During this blood draw, Deputy Abplanalp noticed needle marks on Michael's arm. Both Michael and Gina were taken to jail.

¶ 10 On a writ of certiorari, we review the decision of the court of appeals, not that of the trial court. *See Harmon,* 910 P.2d at 1199. In reviewing a court of appeals' decision, we apply the same standard of review used by the court of appeals. *See id.* The court of appeals determined that there was insufficient evidence from which a reasonable person could have concluded that Michael possessed the drugs and paraphernalia. The court of appeals' majority analyzed this question through a discussion of reasonable alternative hypotheses that could innocently explain the various items of evidence. The dissenting judge concluded that such alternative hypotheses need to be raised by the defendant at trial if they are to be addressed on appeal; the majority disagreed. We decline to address this question because we conclude that this case can and should have

been decided by applying an ordinary sufficiency of the evidence test. There was no need to resort to the alternative hypothesis analytical model.

¶ 11 Michael was convicted of the offenses of possession of a controlled substance with intent to distribute and possession of paraphernalia. There was no evidence showing that Michael had actual possession of either the methamphetamine or the paraphernalia in the pouch carried by Gina; therefore, the only basis for the conviction could have been that Michael was in constructive possession of Gina's pouch and its contents. *See State v. Fox,* 709 P.2d 316, 319 (Utah 1985).

¶ 12 When reviewing a conviction, an appellate court should consider the facts in a light most favorable to the verdict. *See State v. Brown,* 948 P.2d at 339. An appellate court should overturn a conviction for insufficient evidence when it is apparent that there is not sufficient competent evidence as to each element of the crime charged for the fact-finder to find, beyond a reasonable doubt, that the defendant committed the crime. *See State v. James,* 819 P.2d 781, 784–85 (Utah 1991) (citing *State v. Warden,* 813 P.2d 1146, 1150 (Utah 1991)); *Fox,* 709 P.2d at 318.

¶ 13 We begin by determining whether the court of appeals correctly found that the trial judge, who was the finder of fact in this case, could not have found beyond a reasonable doubt that Michael knowingly and intentionally "possessed" the methamphetamine and paraphernalia in Gina's pouch. *See Fox,* 709 P.2d at 319; Utah Code Ann. § 58–37–8 (1998), § 58–37a–5(1) (Supp.1998). To prove that Michael had constructive possession, it is necessary that "there [be] a sufficient nexus between the accused and the drug [or paraphernalia] to permit an inference that the accused had both the power and the intent to exercise dominion and control over the drug [or paraphernalia]." *Fox,* 709 P.2d at 319. There must be facts which show that the accused intended to use the drugs or paraphernalia as his own. *See id.*

¶ 14 As this court recognized in *Fox,* the existence of a sufficient nexus to prove constructive possession is a highly fact-sensitive determination. To that end, *Fox* laid out four factors relevant to a determination of

whether constructive possession has been proven. In *Fox*, the question was whether a homeowner constructively possessed drugs that were found in a room of a home he shared with his brother. In *State v. Salas*, 820 P.2d 1386 (Utah Ct.App.1991), a case where an individual was driving a vehicle containing passengers and where drugs were found in the back seat, the Utah Court of Appeals added several other factors it thought relevant to determining constructive possession. While the different factors listed in these cases might be of help in guiding a finder of fact in determining whether there was constructive possession, they are factors particularly relevant to the specific factual context in which those cases arose. They are not universally pertinent factors, and they are not legal elements of constructive possession in any context.

¶ 15 We take this occasion to note that there is some danger in mechanically relying on a list of factors, such as those set out in *Fox* and *Salas*, when applying a generally-worded test, such as *Fox*'s statement of what is needed to show constructive possession. The danger is that each factual situation will lead the appellate courts to set out a new list of factors, and succeeding appellate and trial courts will come to rely on those factors as amounting to a checklist of things that must be present if the law's requirements are to be met, rather than seeing the factors as only some of the relevant considerations in making the underlying determination. *See, e.g., Soter's Inc. v. Deseret Fed. Sav. & Loan Ass'n*, 857 P.2d 935, 939–40 (Utah 1993). There is nothing wrong with a succeeding court considering factors that were considered relevant by an appellate court analyzing a factually-similar context. But both trial and appellate courts need to be mindful that no such list is exhaustive, and that listed factors are only considerations. The final legal test is the most generally-worded one: here, whether there was a sufficient nexus between the defendant and the drugs or paraphernalia to permit a factual inference that the defendant had the power and the intent to exercise control over the drugs or paraphernalia. *See Fox*, 709 P.2d at 318.

¶ 16 The present case is not a house or car case. Here, the question is whether Michael had sufficient control over another person to prove constructive possession of something that person had in her physical possession. Rather than looking to the factors listed in *Fox* and *Salas*, we refer to the general test that those factors were used to implement in the specific *Fox* and *Salas* situations, to wit, whether there was evidence of a sufficient nexus between the defendant and the drugs or paraphernalia to permit a factual inference that the defendant had the power and the intent to exercise control over those drugs or paraphernalia. *See id.* Stated differently, to show constructive possession, the State must prove beyond a reasonable doubt that the drugs were subject to the defendant's dominion and control and the defendant had the intent to exercise that control. *See id.* We conclude that the court of appeals properly found the evidence in this case is insufficient. When all the brush is cleared, the critical fact is that there was little evidence to prove that Michael had such control over Gina's person that one could reasonably infer beyond a reasonable doubt that he knowingly and intentionally possessed the drugs and paraphernalia in her pouch. The only fact tending to prove Michael's control over Gina is that she looked at him when the deputy requested to see the pouch and that Michael shook his head in a negative fashion. This simply is not enough. All the other evidence in this case does nothing to address this critical factual issue. Neither her presence in his vehicle, his erratic behavior after the traffic stop, nor his use of drugs at some earlier time make up for this critical lack of evidence.

¶ 17 We therefore affirm the court of appeals.

¶ 18 Associate Chief Justice DURHAM and Justice RUSSON concur in Justice ZIMMERMAN'S opinion.

¶ 19 Justice STEWART concurs in the result.

¶ 20 Chief Justice HOWE does not participate herein.